# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JOSHUA NAKAGAWA,<br><br>        Plaintiff,<br><br>    vs.<br><br>COUNTY OF MAUI; MAUI POLICE DEPARTMENT; ERIC LOSVAR; HARRY MATSUURA; RUSSELL KAPAHULEHUA; and JUN HATTORI,<br><br>        Defendants. | CIVIL No. 11-00130 DKW-BMK<br>(Consolidated Cases)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| ANTHONY LUM-JOHN,<br><br>        Plaintiff,<br><br>    vs.<br><br>COUNTY OF MAUI; MAUI POLICE DEPARTMENT, ET AL.<br><br>        Defendants. | CIVIL No. 12-00569 DKW-BMK<br>(Other Non-Motor Vehicle Tort) |

## ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

On July 18, 2010, at approximately 4:13 a.m., Maui Police Department ("MPD") Officers Eric Losvar, Russell Kapahulehua, Jun Hattori, and Harry Matsuura, Jr., investigating reports of gunshots fired at a local beach north of Lahaina, encountered two vehicles approaching from the opposite direction on a dark, secluded road.   Despite instructions from the officers to stop, one of the vehicles, a black Toyota pickup truck, slowed and then suddenly accelerated, striking Officer Losvar in an attempt to flee.   All four officers immediately responded by discharging their service weapons in an effort to halt the fleeing driver, inadvertently hitting Plaintiffs Lum-John and Nakagawa, who were passengers in the bed of the Toyota.   Because the officers were then unaware of Lum-John and Nakagawa's presence in the truck, and reacted reasonably in response to the danger that the truck presented, the officers did not violate Plaintiffs' civil rights, are immune from suit, and are entitled to summary judgment.

## BACKGROUND

### I.     July 18, 2010 Incident

In the early morning hours of July 18, 2010, Nakagawa and Lum-John attended a party at "Windmills" beach in a secluded area of West Maui.   Windmills is accessible by a dirt road that requires the use of a four-wheel-drive vehicle. Honoapiilani Highway is the narrow, two-lane road that connects the Windmills access road to Lahaina.   Defs.' Exs. J (Aerial Photograph) and L (Matsuura Decl.) ¶ 5.   During the party, Nakagawa got into a fight with several unknown assailants, during which he was struck on the head by a bottle or rock and cut on the forearm by a jagged piece of glass.   Lum-John and others removed Nakagawa from the area of the fight and into the bed of a Toyota pickup truck, which was parked near Honoapiilani Highway.   Eight people departed the scene of the party in the Toyota: four in the crew cab and four in the bed of the truck, including Nakagawa and Lum-John who were sitting with their backs against the tailgate, facing forward. *See* Nakagawa Mem. in Opp. at 1-2.

At 4:13 a.m., Maui County dispatch received a report of shots fired at Windmills, but did not have any information about the suspects.   Sergeants Russell Kapahulehua and Harry Matsuura, Jr. responded to the call from the Lahaina station, along with Officers Jun Hattori and Eric Losvar.   The four responding officers first

met along Honoapiilani Highway at Office Road in Kapalua and then drove their four patrol cars north on Honoapiilani Highway in tandem, toward Windmills. Defs.' Ex. M at 22 (1/9/14 Kapahulehua Dep. Tr.).   Kapahulehua, who was in front of the other officers, saw a vehicle approaching in the southbound direction, turned on his blue emergency lights, and motioned to the vehicle, a black Infiniti, to stop. Kapahulehua parked his patrol car in the northbound lane, and with his strobe lights on, exited his vehicle and approached the Infiniti from the rear of the driver's side with his firearm drawn.   Defs.' Ex. M at 26.   Hattori and Matsuura parked immediately behind Kapahulehua's vehicle.   Matsuura and Kapahulehua reached the driver's side door of the Infiniti at approximately the same time, while Hattori approached the passenger's side of the vehicle.   *Id.* at 27.   The MPD officers ordered the occupants of the Infiniti to show their hands.   Defs. Exs. Q and W (1/9/14 Hattori Dep. Trs.).

Losvar was not as familiar with the winding Honoapiilani Highway and was the last to arrive at the black Infiniti.   Defs.' Ex. R (1/9/14 Losvar Dep. Tr.) at 14-16.   When he reached the scene, he could see the emergency lights and the other MPD officers near the Infiniti.   Defs.' Ex. R at 16-17.   According to Losvar, he parked on the Lahaina, or southbound side, of the Infiniti.   Defs.' Ex. R. at 17; Defs.' Ex. K (Diagram of Officers' Positions).   One of the officers asked the

4

occupants of the Infiniti about the report of gunshots, and, according to Losvar: "I heard one of the people [in the Infiniti], one of them said, 'Yeah some guys in. . . a Toyota truck, they're the ones that were firing the gun.'"   Pls.' Ex. C (7/18/10 MPD Report) at 8-9.

Within seconds of addressing the Infiniti's occupants, Kapahulehua heard tires approaching from the northbound Windmills direction.   Defs.' Ex. N (1/9/14 Kapahulehua Dep. Tr.) at 29.   He turned from the Infiniti and walked in the northbound lane along the patrol vehicles to meet the approaching vehicle.   Defs.' Exs. K and N at 36.   Around the same time, Losvar was at the driver's side of the Infiniti and also heard the sound of the approaching tires.   He followed Kapahulehua from a distance of approximately five feet.

Based on the change in the sound of the tires, both Kapahulehua and Losvar perceived that the approaching vehicle was slowing down.   Defs.' Exs. N at 30-31 and S at 23.   As the vehicle neared, Kapahulehua could clearly see the driver of a black Toyota pickup truck.   The driver's side window was partially down and Kapahulehua instructed the driver to stop the truck and display his hands.   In response, the driver said "What?," causing Kapahulehua to repeat the instructions. As he did so, Kapahulehua had to look up because the truck was raised or lifted, with large off-road tires.   At that point, Kapahulehua had a clear view of the driver's

face, but saw no other occupants.   Defs.' Exs. N at 32-33 and DD (Kapahulehua Decl.).

Kapahulehua expected the truck to stop because it had been slowing down as it approached the patrol cars with their activated emergency lights.   Defs.' Ex. N at 33, 42.   Lum-John, in the bed of the truck, also thought the truck was going to stop because it had slowed to the pace of someone walking.   Defs.' Exs. FF and GG (1/17/14 Lum-John Dep. Trs.).   The driver, however, shifted his focus from Kapahulehua to the front of the truck, and suddenly accelerated, veering left toward the gap between Matsuura's patrol car and the Infiniti.   Defs. Ex. N at 33-35. Lum-John slammed into the back of the tailgate as a result of the Toyota's acceleration.   Defs.' Ex. GG at 129, 134.

As the Toyota accelerated, Kapahulehua states that he was afraid of being pinned between the truck and a patrol car and jumped back to avoid being struck.   Defs.' Ex. N at 35-36.   Kapahulehua saw the Toyota strike Losvar, who was in the gap between Matsuura's patrol car and the Infiniti's bumper, launching Losvar into the air and causing him to disappear in front of the truck.   Defs.' Ex. S at 22, 25.   Fearing Losvar would be run over, Kapahulehua raised his gun and fired three shots at the driver's head in quick succession.   Because of the truck's angle, Kapahulehua claims he had a clear view of the driver, but stopped firing when that

6

view became obscured.   It was at that time, according to Kapahulehua, that he first became aware that there were passengers in the truck.   Defs.' Ex. O (1/9/14 Kapahulehua Dep. Tr.); Defs.' Exs. AA (1/9/14 Kapahulehua Dep. Tr.) and DD.

Despite being struck by the truck in the right hip, and being thrown off on the driver's side of the truck, Losvar was also able to fire at the Toyota's driver because he believed that Matsuura was in danger of being struck next or killed.[1] Defs.' Ex. T (1/9/14 Losvar Dep. Tr.) at 30-40.   Losvar ceased firing, however, as soon as he saw someone in the bed of the truck on the driver's side.   Pls.' Ex. C (7/18/10 MPD Report) at 15.

Matsuura was behind Losvar when he saw the Toyota accelerate and strike Losvar.   From Matsuura's perspective, Losvar appeared to have been projected over the truck before being run over.   Matsuura believed that Losvar had fallen under the truck's tires after being launched over the hood.   Defs.' Ex. U (1/10/14 Matsuura Dep. Tr.) at 30-36.   At that point, Matsuura was directly in the truck's path.   As the truck accelerated towards him, Matsuura ran out of the way, turned and fired one shot at the driver through the windshield.   Defs.' Ex. U at 37-39.

---

[1] Losvar believed that the driver of the truck intentionally struck him because, immediately before the truck accelerated, he made eye contact with the driver.   Defs.' Ex. T.

From across the road, on the passenger side of the Infiniti, Hattori saw the truck accelerate towards the area where he had last seen Matsuura and Losvar. Hattori believed that both officers' lives were at risk and fired toward the driver of the Toyota.   According to Hattori, besides the driver, he never saw any of the other occupants of the truck.   Defs.' Exs. P and X (1/9/14 Hattori Dep. Trs.).

In all, nine shots struck the truck.   Defs.' Exs. D and E (Photographs). Lum-John was hit by a single bullet in the left hip, taken to the hospital by medics and discharged later that same day.   Defs.' Ex. KK.   Nakagawa was shot twice in the right shoulder and grazed by a third bullet.   Defs.' Ex. LL.   According to Plaintiffs, none of the officers pointed their firearms in their direction until after the Toyota accelerated, striking Losvar.   Defs.' Exs. GG at 130 and JJ.

The parties disagree about portions of the record.   According to the County, as the truck approached the officers, Lum-John sat with his back touching the tailgate on the passenger side, and tried to hide the injured Nakagawa from the police.   Plaintiffs dispute that Lum-John "hid" Nakagawa from the police.   Indeed, they also claim that Kapahulehua saw Nakagawa, ostensibly before discharging his firearm.   Pls.' Exs. G at 44; Ex. H at 17-18; Ex. I at 3; Ex. J at 19.

Plaintiffs also dispute that Kapahulehua saw the truck strike Losvar or that he was in fear of Losvar being run over.   They claim that Losvar rolled over the

8

hood of the pickup and landed on his feet directly next to the driver-side door, which

Kapahulehua had been standing next to moments before.   Pls.' Ex. B at 31-32, 34;

Ex. F at 17; Ex. G at 38.

Another passenger in the Toyota's bed, Kalen Agarano, claims that one

of the officers first asked if the group knew anything about shots being fired at

Windmills, and that the same officer then told them to put their hands in the air.

Pls.' Ex. A (7/18/10 MPD Report.).   Defendants deny that any of the officers saw

any of the passengers in the truck prior to firing at the Toyota's driver.

Neither Nakagawa nor Lum-John was arrested following the incident.

According to the County, the driver of the Toyota, Austin Pierman, was charged

with attempted murder, charges that remain pending.   Defs.' Ex. PP.

## II.   Plaintiffs' Claims

Plaintiffs allege that Nakagawa was struck three times and Lum-John

was struck once by the MPD officers' bullets.   *See* Nakagawa First Amended

Complaint ¶¶ 27, 29; Lum-John Complaint ¶¶ 27, 33.   Plaintiffs' complaints

include the following causes of action: assault (Count I); battery (Count II);

intentional infliction of emotional distress ("IIED") (Count III); negligence (Count

IV); negligent infliction of emotional distress ("NIED") (Count V); violation of 42

U.S.C. § 1983 based on the Fourth, Fifth, Eighth, and Fourteenth Amendments

(Count VI); municipal liability for violation of 42 U.S.C. § 1983 ("*Monell* claim") (Count VII); and negligent supervision and training (Count VIII).   Defendants seek summary judgment on all counts.

At the March 5, 2014 summary judgment hearing, Plaintiffs conceded that Defendants are entitled to summary judgment as to Count I (assault) and Count VIII (state law claims for negligent supervision and training).   On March 21, 2014, Plaintiffs stipulated to dismiss all claims against Matsuura.   Dkt. No. 141.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   If that burden is met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 588 (1986).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Id*. at 585.   Also, "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position is

not sufficient[ ]" to defeat summary judgment.   *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).   Likewise, the nonmoving party "cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."   *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).   The Court must draw all reasonable inferences in favor of the nonmoving party.   *Matsushita,* 475 U.S. at 587.

## DISCUSSION

### I.   Section 1983 Claims Against MPD Officers (Count VI)

Under 42 U.S.C. § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Plaintiffs concede that their § 1983 claims for violations of the Fifth and Eighth Amendments should be dismissed.   Accordingly, their remaining claims are based on the Fourteenth and Fourth Amendments.

### A. Defendants Did Not Violate Nakagawa Or Lum-John's Civil Rights Under Either the Fourteenth Or Fourth Amendments

Although Plaintiffs' excessive force claims are properly analyzed under the Fourteenth Amendment because no seizure occurred, the Court concludes

that Plaintiffs cannot maintain a claim under either the Fourteenth or Fourth

Amendment, and that Defendants are entitled to summary judgment.

### 1.    Plaintiffs Were Not "Seized," Requiring the Application of Fourteenth Amendment Analysis

To determine whether Plaintiffs' Fourth Amendment right against

unreasonable seizures was violated, the Court first looks to whether Plaintiffs were

"seized."   *Brower v. County of Inyo*, 489 U.S. 593, 595-97 (1989).   A person is

"seized" within the meaning of the Fourth Amendment if "by means of physical

force or show of authority, his freedom of movement is restrained."   *United States

v. Mendenhall*, 446 U.S. 544, 553 (1980).   However, not every such restraint

amounts to a seizure.   As the *Brower* court explained,

> a Fourth Amendment seizure does not occur whenever there is a
> governmentally caused termination of an individual's freedom
> of movement (the innocent passerby), nor even whenever there is
> a governmentally caused and governmentally desired
> termination of an individual's freedom of movement (the fleeing
> felon), but only when there is a governmental termination of
> freedom of movement *through means intentionally applied*.

498 U.S. at 596-97 (1989) (emphasis in original); *see also Reed v. Hoy*, 909 F.2d

324, 329 (9th Cir. 1990) ("The *Brower* analysis breaks down into a three-part test: a

seizure is a (1) governmental (2) termination of freedom of movement (3) through

means intentionally applied.").

12

As this district court recognized in *Edenfield v. Estate of Willets*, 2006 WL 1041724 at *7-8 (D. Haw. Apr. 14, 2006), the "Ninth Circuit has not addressed whether inadvertent injuries that a police officer inflicts on . . . an innocent bystander while attempting to stop another person constitute a seizure under the Fourth Amendment." *Edenfield* noted that circuits that have addressed the issue focus on the question of "to whom or at what the officers directed their physical restraint." *Id*. at *7. In cases where a plaintiff was the target of an officer's conduct, courts generally find that the officer effected a Fourth Amendment seizure. *See, e.g., Ciminillo v. Streicher*, 434 F.3d 461, 464-66 (6th Cir. 2006) (concluding that plaintiff was "not collaterally injured by an assertion of force against a third party," and, thus, was seized, and finding that force used to effect seizure was unreasonable); *Fisher v. Memphis*, 234 F.3d 312, 315 (6th Cir. 2001) (plaintiff was seized when car in which she was riding was the target of the officer's "intentionally applied exertion of force").

In contrast, when the § 1983 plaintiff was not the target of an officer's conduct, courts have concluded that the plaintiff was not seized. *See, e.g., Rucker v. Harford Co.*, 946 F.2d 278, 280-81 (4th Cir. 1991) (plaintiff, whom officers did not know was in vicinity, and was shot as officers fired at suspect, was not seized because plaintiff was not the "intended object of a physical restraint");

13

*Landol-Rivera v. Cosme*, 906 F.2d 791 (1st Cir. 1991) (plaintiff, a known hostage, who was shot when officers attempted to seize hostage-taker was not "seized" because officers' actions were directed at restraining the hostage taker).   The facts in these cases show an intent, or lack thereof, to restrain the plaintiff's freedom of movement.   As summarized in *Edenfield*,

> whether Plaintiffs were seized by the Officers turns on whether the Officers intended to direct their physical restraint at Plaintiffs and/or the truck. . . .   [I]f the Officers were unaware of Plaintiffs' presence, it may be that no seizure occurred, as the Officers could not have intended to direct their restraint against them. . . .   Thus, to determine whether Plaintiffs were seized, the court must decide how the Officers were directing their physical restraint.

*Edenfield*, at *10 (citations omitted).

In this case, the officers were not aware of Plaintiffs' presence in the bed of the truck before they discharged their firearms.   Defs.' Ex. O (1/9/14 Kapahulehua Dep. Tr.); Defs.' Exs. AA (1/9/14 Kapahulehua Dep. Tr.); P and X (1/9/14 Hattori Dep. Trs.); Pls.' Ex. C (7/18/10 MPD Report) at 15.   Plaintiffs argue that Kapahulehua saw one passenger in the bed of the truck, but do not raise any question of fact beyond their own speculation that Kapahulehua actually saw *Plaintiffs* before he discharged his firearm.   Plaintiffs solely rely on the statements of Agarano, who told police that he was seated in the bed of the truck, directly

14

behind the driver.   Pl.'s Ex. A. at 7.   According to Plaintiffs, Agarano told investigators that one of the officers, presumably Kapahulehua, saw him in the bed of the truck before the shooting began.   When asked about this contact, Agarano replied as follows:

> Like, at, yeah I did at first, 'cause like he was walking up from the side and I put my hands up in the air, like he saw me like turn to 'em like with my hands up' cause he's like, put your hands up and pull the car over and like I put hands up and look at 'em and like then the driver just took off.   And then I just saw him reach for it and I just ducked and then I heard it.

Pl.'s Ex. A. at 13.   As best the Court can discern, Agarano believes that Kapahulehua saw him put his hands in the air.   According to Kapahulehua, however, he "did not see any occupants in the bed of the truck.   I only became aware that an occupant may have been in the bed of the truck after I had fired my gun and saw skin in the left tailgate area of the truck bed.   I did not see any other occupants in the truck bed."   Defs.' Ex. AA ¶ 4.   Viewing the evidence in the light most favorable to Plaintiffs, there is a question of fact as to whether Kapahulehua saw Agarano in the bed of the truck.   However, there is no question that Kapahulehua did not see Plaintiffs themselves in the bed of the truck, nor have Plaintiffs offered any evidence that any officer other than Kapahulehua, saw any one in the bed of the truck before the onset of shooting.   Moreover, whether or not

15

Kapahulehua saw Agarano is not dispositive of whether a seizure occurred.   The issue is whether the officers directed their physical restraint at Plaintiffs.   The evidence here is that they did not.   *See* Defs.' Ex. O at 41-42 (Kapahulehua fired three shots in rapid succession "where [he] believed the driver's head to be."); Ex. T at 34-40 (Losvar shot at driver and "stopped shooting when 'he lost that line of sight on the driver's seat[.]'"); Ex. P at 51 (Hattori was "focused on the area of the driver[.]'").

Because there is no dispute that each of the officers fired their weapons at the driver of the truck (Austin Pierman) unaware of the presence of either Plaintiff, there was no seizure of either Plaintiff for Fourth Amendment purposes.

### 2.   The Officers' Conduct Does Not Shock The Conscience

In cases involving injuries caused by law enforcement officers, a substantive due process analysis under the Fourteenth Amendment is appropriate where, as here, the Fourth Amendment does not apply.   *Sacramento v. Lewis*, 523 U.S. 833, 844-45 (1998).   A substantive due process violation requires that law enforcement officers' conduct "shock the conscience."   *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

At the March 4 summary judgment hearing and in their briefing, Plaintiffs all but concede their inability to meet this standard.   At each stage of the

16

rapidly evolving encounter, each officer was forced to make split-second decisions. The Toyota driver initially slowed his vehicle as he approached the officers, giving the clear impression that he intended to heed Kapahulehua's instruction to stop. Instead, the driver surprised not only the officers, but his own passengers, by suddenly accelerating in an apparent attempt to flee the scene, striking Losvar as he did so, and bearing down on Matsuura in a similar fashion.   With no time to communicate or coordinate, each officer independently decided to draw and fire his service weapon to halt the driver's actions and protect the officers who were in immediate and obvious danger.   A "purely reactive decision" does not evidence an intention to "induce . . . lawlessness, or to terrorize, cause harm, or kill."   *Porter*, 546 F.3d at 1140 (quoting *Sacramento v. Lewis*, 523 U.S. 833, 855 (1998)).   Nor is there any evidence, and Plaintiffs have cited none, that the officers acted with a purpose "to cause harm unrelated to the legitimate object of arrest" or self-protection.   *Porter*, 546 F.3d at 1140.   Indeed, there is no evidence to suggest that the officers had any motive other than legitimate law enforcements objectives, beyond Plaintiffs' speculative arguments that the officers fired at the driver in retaliation for running over Officer Losvar.

Accordingly, because none of the evidence – including the evidence offered by Plaintiffs – approaches the "shocks the conscience" standard necessary to

prevail on a Fourteenth Amendment claim, Defendants are entitled to summary judgment.

### 3.    The Officers Employed Objectively Reasonable Force

Plaintiffs urge the use of the Fourth Amendment analytic applicable where a "seizure" has occurred.   They do so because, under the Fourth Amendment, the propriety of an officer's conduct is measured by an objectively reasonable standard, rather than by the *Porter* "shocks the conscience" standard.   Even were the Court to heed Plaintiffs' request, the result would be no different.

Under the Fourth Amendment, "officers may only use such force as is 'objectively reasonable' under the circumstances."   *See Jackson v. City of Bremerton,* 268 F.3d 646, 651 (9th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).   To determine whether the force used was reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 397.

Determining whether a police officer's use of force was reasonable or excessive "requires careful attention to the facts and circumstances of each particular case" and a "'careful' balancing of an individual's liberty with the government's interest in the application of force."   *Santos v. Gates*, 287 F.3d 846,

854 (9th Cir. 2002) (quoting *Graham*, 490 U.S. at 396).   When evaluating the

nature and quality of the intrusion, the Court considers the "type and amount of force

inflicted."   *City of Bremerton*, 268 F.3d at 651-52 (quoting *Chew v. Gates*, 27 F.3d

1432, 1440 (9th Cir. 1994).   When evaluating the governmental interest in the use

of force, courts examine three main factors: (1) the severity of the crime at issue; (2)

whether the suspect poses an immediate threat to the safety of the officers or others;

and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.

*Bryan v. McPherson*, 630 F.3d 805, 825 (9th Cir. 2010).[2]   The "most important" of

these factors is whether the suspect posed an "immediate threat to the safety of the

officers or others."   *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005).

Here, the evidence objectively supports the following: the officers

responded to a 911 report of gunshots fired by unknown parties in a remote area of

Maui accessible only on foot or by 4x4 vehicle.   As they approached the area of the

reported gunshots, the officers encountered two vehicles headed towards them.

The first vehicle stopped at the officers' command.   The second vehicle, a Toyota

4x4 truck, appeared at first to be following suit, but then as quickly as he

---

[2] These three factors are not exclusive.   Courts may also examine the "totality of the circumstances" and "whatever specific factors may be appropriate in a particular case." *McPherson*, 630 F.3d at 825 (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).

decelerated, the Toyota driver accelerated, attempting to flee.   As the driver did so, the Toyota struck Officer Losvar in an apparent attempt to grievously injure him (or worse).[3]   The driver then appeared to bear down on the next officer in the area, Officer Matsuura.   At that time, each officer made what was clearly a split-second decision to fire on the Toyota's driver to halt the progress of the vehicle and to prevent it from both running over Officer Losvar and running into Officer Matsuura. Indeed, even Plaintiffs do not dispute critical facts set forth in Defendants' Concise Statement:

> 23.    Officer Losvar was struck by the truck and tossed over the hood.   After landing on his feet near the driver's door, Officer Losvar began shooting at the driver because he believed that Sergeant Matsuura was in danger of being struck or killed.
>
> 24.    Sergeant Matsuura saw the truck accelerate, turn left and strike Officer Losvar.   From Sergeant Matsuura's perspective, Officer Losvar appeared to go up and over the truck before being run over.   Sergeant Matsuura was directly in the truck's path. He began running then turned and fired one shot at the driver through the windshield to stop the truck from running him over.
>
> 25.    Officer Hattori saw the truck accelerate towards the area where he had last seen Sergeant Matsuura and Officer Losvar. Officer Hattori believed that both officers' lives were at risk. To save his partners from injury, Officer Hattori made a split second decision to shoot at the driver.

---

[3]As stated, *infra*, the Toyota's driver has been charged with attempted murder, a charge that is currently pending.  *See* Def's Ex. PP.

Based on these undisputed facts and Plaintiffs' admissions, Plaintiffs' Fourth Amendment claims cannot stand as to Losvar and Hattori.[4]   Plaintiffs do not contest that Hattori and Losvar employed deadly force in an attempt to subdue a suspect who posed an imminent and serious threat to the safety of themselves and/or their fellow officers.   Such force was objectively reasonable under the circumstances, and no reasonable jury could find otherwise.   Accordingly, Plaintiffs' only remaining Fourth Amendment claim lies against Kapahulehua.

However, Kapahulehua's use of force in firing at the driver of the fleeing truck was no less reasonable than his peers.   In *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), the Ninth Circuit reversed the district court's denial of an officer's motion for summary judgment in similar circumstances.   In *Wilkinson*, the driver initiated a low-speed chase in a stolen minivan.   *Id.* at 549.   One officer positioned his vehicle in front of the minivan, which swerved and hit a telephone pole.   Two officers then approached the minivan on foot and ordered the driver to exit.   One officer attempted to open the driver-side door, but fell as the minivan reversed, its wheels spinning in mud.   While the first officer recovered his footing

---

[4] Nor, based on these admissions, would their Fourth Amendment claim stand as against Matsuura had Plaintiffs elected not to voluntarily dismiss him.   *See* Dkt. No. 141.

and dodged the minivan, the second officer on the passenger-side believed that the first had been run over and began shooting at the minivan, firing eleven rounds.  *Id.*

The Ninth Circuit held that the officer "had probable cause to believe that [the driver] posed an immediate threat to the [first officer] and himself."  *Id.* at 551.  It noted that before discharging his firearm, the officer stood in a "slippery yard with a minivan accelerating around him," that the driver "had failed to yield to police sirens," and that "a fellow officer was nearby either lying fallen on the ground or standing but disoriented."  *Id.*  *Wilkinson* concluded that, where "the driver of a moving vehicle . . . [is] ignoring police commands, attempt[ing] to accelerate within close quarters of two officers on foot," the officer had probable cause to believe "that the threat to safety justified the use of deadly force."  *Id*.

The facts here dictate a similar outcome.  Kapahulehua stood in a remote and darkened roadway with a Toyota truck accelerating around him, whose driver had failed to yield to his command, and whose fellow officers had either just been struck by the vehicle or were in the vehicle's path.  Under these circumstances, Kapahulehua's instantaneous decision to fire at the driver is no different than the officer's conduct countenanced by the Ninth Circuit in *Wilkinson*.  *See Graham*, 490 U.S. at 397 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than

22

with the 20/20 vision of hindsight."); *Wilkinson*, 610 F.3d at 550 (The Court makes "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

Accordingly, even analyzing Plaintiffs' excessive force claims under a Fourth Amendment rubric, Defendants are entitled to summary judgment.

### B.   <u>The Officers Are Entitled To Qualified Immunity</u>

Defendants also move for summary judgment based on qualified immunity.   The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).   "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."   *Id*. (internal quotation marks omitted).

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."   *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011).

The Supreme Court has held that district courts "may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the more difficult question whether the purported right exists at all."   *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (citing *Pearson*, 555 U.S. at 236).

To be clearly established, a constitutional right must be sufficiently clear "that every reasonable official would have understood that what he is doing violates that right."   *al-Kidd*, 131 S. Ct. at 2083.   Plaintiffs have the burden of proving the existence of a clearly established constitutional right.   *Doe v. Petaluma City School Dist.*, 54 F.3d 1447, 1450 (9th Cir. 1995).   It is the Defendants' burden to show that a "reasonable . . . officer could have believed, in light of the settled law, that he was not violating a constitutional or statutory right."   *V-1 Oil Co. v. Smith*, 114 F.3d 854 (9th Cir. 1997).

For the reasons described above, the Court concludes that Defendants are entitled to summary judgment on Plaintiffs' federal claims against the MPD officers because, even drawing all reasonable inferences in Plaintiffs' favor, there

24

was no violation of their constitutional rights.   The Court, therefore, need not reach the second step in the *al-Kidd* qualified immunity analysis.[5]

## II.   <u>Section 1983 Claims Against County (Count VII)</u>

### A.   <u>Municipal Liability Claim Against the County</u>

Plaintiffs allege that the County of Maui is liable under § 1983 for MPD's policy and custom "to tolerate and ratify the use of unreasonable . . . uses of force by its police officers."   Nakagawa Complaint ¶ 68; Lum-John Complaint ¶ 66.   Local governmental bodies such as the County are "persons" that may be sued under § 1983.   *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).   Municipal liability under § 1983 may be established in one of three ways:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.   Second, the plaintiff may establish that the individual who committed the constitutional tort was an

---

[5]In any event, Plaintiffs fail to point to any right clearly established at the time of the challenged conduct.   Their citation to *Tennessee v. Garner*, 471 U.S. 1 (1985), is unavailing under the specific facts and circumstances of this case and does not satisfy their burden of proving that the right allegedly violated was clearly established at the time of the alleged misconduct.   *See Brosseau v. Haugen*, 543 U.S. 194, 199-20 (2004) (explaining that *Graham* and *Garner* "are cast at a high level of generality" and cannot, in every case, "offer a basis for decision"); *al-Kidd*, 443 131 S. Ct. at 2084 (the Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality.") (citations omitted).   Because they offer no other citation, Plaintiffs fail to prove that the officers violated clearly established law at the time of the July 18, 2010 incident.

official with final policy-making authority and that the
challenged action itself thus constituted an act of official
governmental policy.   Whether a particular official has final
policy-making authority is a question of state law.   Third, the
plaintiff may prove that an official with final policy-making
authority ratified a subordinate's unconstitutional decision or
action and the basis for it.

*Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1993) (citations and internal

quotations omitted).

Plaintiffs argue that the County's liability arises under the ratification

theory of liability because "the officer's use of deadly force was found to be justified

by an Internal Affairs investigation more than two years after the fact, and this

finding was later ratified by the Chief of Police."   Nakagawa Mem. in Opp. at 23.

First, the Court notes its previous finding that the officers themselves

committed no constitutional violations.   Even if the opposite were true, however,

the Court agrees with the County that, even if unconstitutional actions were taken by

the officers and then ratified by the Maui Chief of Police, the singular July 18, 2010

incident cannot constitute a County policy that was the "moving force" behind the

alleged constitutional violations.   Accordingly, Plaintiffs "must show the decision

was the product of a conscious, affirmative choice to ratify the conduct in question.

Such a ratification 'could be tantamount to the announcement or confirmation of a

policy for purposes of *Monell*.'"   *Edenfield*, 2006 WL 1041724, at *16 (quoting

26

*Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003), *reversed on other grounds by Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam)).  *See also Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (ratification requires proof of a policymaker's knowledge of the alleged constitutional violation); *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) (ratification requires an adoption and express approval of the acts of others who caused the constitutional violation); *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (an official policymaker must "make a deliberate choice from among various alternatives to follow a particular course of action").   Plaintiffs fail to make any such showing.

Moreover, the policymaker must deliberately choose to "endorse" the subordinate's conduct and the basis for it "before the policymaker will be deemed to have ratified the subordinate's discretionary decision."   *Gillette*, 979 F.2d at 1348. A mere failure "to overrule the unconstitutional discretionary acts of subordinates[,]" without expressly endorsing or approving of the conduct, is an insufficient predicate for the imposition of liability against the municipality.   *Id.* Plaintiffs present no evidence that the Chief of Police or any other policy maker expressly approved or adopted the acts of the officers.   Nor do Plaintiffs offer any evidence that the alleged ratification was accompanied by extenuating or egregious circumstances.   There must exist "something more" than the mere evidence "that a

27

policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures." *Garcia v. City of Imperial*, 2010 WL 3911457, at *2 (S.D. Cal. 2010) (citing *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003) and *Larez v. City of Los Angeles*, 946 F.2d 630, 646-648 (9th Cir. 1991)).   No such "something more" exists on the current record.   Accordingly, the County is entitled to summary judgment on Count VII.

### B.    <u>Request for Time to Conduct Additional Discovery</u>

Plaintiff Nakagawa requests time to conduct additional discovery pursuant to Federal Rule of Civil Procedure 56(d) because he "believes that through the discovery process [he] can establish a pattern of such ratifications by the Chief of Police, the result of which is to encourage constitutional violations."   Nakagawa Mem. in Opp. at 23.   Rule 56(d) states:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Whether to deny a Rule 56(d) request for further discovery by a party opposing summary judgment is within the discretion of the district court.   *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 920-21 (9th Cir. 1996).   To obtain a continuance under Rule 56(d), the party opposing a motion for summary judgment must make "(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists."   *Blough v. Holland Realty, Inc*, 574 F.3d 1084, 1091 n.5 (9th Cir. 2009) (citation omitted).

"A party requesting a continuance pursuant to Rule [56(d)] must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment."   *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006).   Moreover, "[t]he burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists."   *Nidds*, 113 F.3d at 921.   The movant must also show diligence in previously pursuing discovery.   *See Pfingston v. Ronan Engineering Co.*, 284 F.3d 999, 1005 (9th Cir. 2002) ("The failure to conduct discovery diligently is grounds for the denial of a Rule 56(f) motion."); *Kocsis v. Delta Air Lines, Inc.*, 2013W L 4011131, at *14 (D. Haw. Aug. 5, 2013) ("[T]he

district court may deny further discovery if the requesting party failed to pursue

discovery diligently in the past.").

> Plaintiff Nakagawa's effort falls short of the rule's requirements.

Counsel's declaration does not identify particular facts that the requested discovery

would reveal.   Rather, it states only that Plaintiff --

> intends to seek information with regard to previous Internal
> Affairs investigations into officer-involved-shootings; the facts
> and circumstances of those shootings; the outcome of criminal
> investigations in those shootings that are required under Maui
> Police General Orders; whether the findings of the IA
> investigations were ratified or denied by policy making officials
> in the Maui Police Department or the County of Maui; and any
> disciplinary actions taken against the involved officers found to
> have acted in violation of the General Orders governing Use of
> Force. . . .   Such evidence will establish, or disprove, facts
> essential to create municipal liability under 42 U.S.C. Section
> 1983 for the actions of police officer employees of the Maui
> Police Department and County of Maui.

Shipley Decl. ¶¶ 3-4.   The declaration notably fails to identify any specific facts

that actually exist or discuss whether any "police-involved-shootings" relevant to

the instant matter have actually occurred.   "Rule [56(d) ] is not a license for a

fishing expedition in the hopes that one might find facts to support its claims."

*Painsolvers, Inc. v. State Farm Mut. Auto. Ins. Co.*, 732 F. Supp. 2d 1107, 1125 (D.

Haw. 2010); *see also Tatum*, 441 F.3d at 110-01 (finding that an attorney declaration

was insufficient to support a Rule 56 continuance where the declaration failed to

specify specific facts to be discovered or explain how a continuance would allow the party to produce evidence precluding summary judgment).

Nor has the required diligence been established.   This case was initiated three years ago, in 2011.   Counsel's declaration does not offer any clue that Plaintiff has been diligent in pursuing the discovery he now seeks.   Instead, Defendants present evidence that the County of Maui previously offered Plaintiff the opportunity to depose Maui Police Chief Gary Yubuta and Captain Wallace Tom on specific dates in January 2014, the depositions that Plaintiffs now claim to need to pursue their claims against the County.   *See Nidds*, 113 F.3d at 921 (movant failed to show diligence in previously pursuing discovery).   Accordingly, the Court DENIES Plaintiff Nakagawa's request for a Rule 56(d) continuance.

Because Plaintiffs offer no further argument or evidence to rebut Defendants' showing that the County of Maui is entitled to summary judgment on Plaintiffs' § 1983 municipal liability claim, the Motion is GRANTED with respect to Count VII.

## III.   <u>State Law Claims (Counts II, III, IV and V)</u>

Under Hawai'i law, non-judicial government officials have a qualified or conditional privilege with respect to their tortious actions taken in the performance of their public duties.   *Towse v. State of Hawaii*, 64 Haw. 624, 631,

647 P.2d 696, 702 (1982)); *see also Medeiros v. Kondo*, 55 Haw. 499, 504, 522 P.2d 1269, 1272 (1974).   There is no dispute here that the allegedly tortious conduct by the MPD officers occurred while performing their public duties.

Government officials are not entitled to immunity when a plaintiff "demonstrate[s] by clear and convincing proof that those officials were stirred by malice and not by an otherwise proper purpose."   *Towse*, 64 Haw. at 631, 647 P.2d at 702.   The Hawaii Supreme Court explained that the word malice has acquired a plethora of definitions," *id.*, and has defined "malice differently in different contexts.   For tort law claims other than defamation, courts apply an "actual malice" test.   *Awakuni v. Awana*, 115 Hawai'i 126, 140-41, 165 P.3d 1027, 1041-42 (2007) (considering "actual malice" to determine immunity in the context of an alleged breach of fiduciary duty); *Edenfield*, 2006 WL 1041724, at *12 (considering "actual malice" to determine immunity for claims of assault, battery, intentional infliction of emotional distress and negligent infliction of emotional distress); *Ogden v. County of Maui*, 554 F. Supp. 2d 1141, 1153 (D. Haw. 2008) (considering "actual malice" to determine immunity for a negligence claim).

To determine whether a defendant acted with actual malice, "the phrase 'malicious or improper purpose' should be defined in its ordinary and usual sense."   *Awakuni*, 115 Hawai'i at 141, 165 P.3d at 1042.   Malice is therefore defined as "the

intent, without justification or excuse, to commit a wrongful act, reckless disregard of the law or of a person's legal rights, and ill will; wickedness of heart." *Id.* (quoting Black's Law Dictionary 976 (8th ed. 2004)) (internal quotation marks omitted).

Because actual malice involves intent, reckless disregard, or ill will, the actual malice requirement is "incompatible with a claim based on negligence." *Bartolome v. Kashimoto*, 2009 WL 1956278, at * 2 (D. Haw. 2009) ("[W]hen 'actual malice' must be shown, a non-judicial official's qualified privilege provides complete immunity from negligence claims.").   Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims for negligence (Count IV) and negligent infliction of emotional distress (Count V).

With respect to Plaintiffs' remaining tort claims for battery (Count II), and intentional infliction of emotional distress (Count III), Plaintiffs point to nothing in the record that raises a genuine issue of fact as to whether the officers were motivated by actual malice, rather than by a desire to protect other officers and themselves.   To be clear, Plaintiffs offer nothing more than their own speculative arguments that the officers acted with malice when they used "deadly force in retaliation for what was alleged to have happened to Officer Losvar, or in retaliation for the refusal of the driver to obey the command to pull-over given by Sgt.

33

Kapahulehua."   Nakagawa Mem. in Opp. at 27.   Plaintiffs fail to meet their burden on summary judgment.   Moreover, because the officers are immune, their immunity extends to the County.   *Reed v. City & Cnty. of Honolulu*, 76 Haw. 219, 227, 873 P.2d 98, 106 (1994) ("It is well-settled that, under the doctrine of *respondeat superior*, an employer is held accountable and liable for the negligent acts of its employees; if an employee is immune from suit, then the employer is also immune from suit and cannot be held liable.").

Because there is no evidence of malice, Defendants are entitled to a qualified privilege under state law, mandating summary judgment in their favor on Counts II, III, IV and V.


//               //


//               //


//               //


//               //


34

## <u>CONCLUSION</u>

On the basis of the foregoing, the Court GRANTS Defendants' Motion for Summary Judgment on all remaining Counts and the Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAIʻI, March 21, 2014.



_____
Derrick K. Watson
United States District Judge

_____
<u>Nakagawa v. County of Maui, CV 11-00130 DKW-RLP; Lum-John v County of Maui; CV 12-00569 DKW-BMK (Consolidated Cases)</u>; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.